IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRANCISCO IBARRA,

        Petitioner,                     No. CIV S-08-2884 GEB CHS P

    vs.

D.K. SISTO,

        Respondent.                FINDINGS AND RECOMMENDATIONS

_____/

I.     INTRODUCTION

        Petitioner Francisco Ibarra is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges the August 15, 2007, decision by the Board of Parole Hearings (hereinafter Board) finding him unsuitable for parole. Upon careful consideration of the record and the applicable law, the undersigned will recommend that this petition for habeas corpus relief be denied.

II.    FACTUAL AND PROCEDURAL BACKGROUND

    A.    Facts

        The Board recited the facts of petitioner's commitment offense as follows:

> PRESIDING COMMISSIONER SHELTON: I'm referring to the appellate ruling that was filed on December 21st, 1989, starts on page two, second paragraph.

1

| | |
|---|---|
| 1 | |
| 2 | "It says the record reveals that shortly after 11:00 a.m. on March - - on Saturday, March something." This is a very poor print of this record, but I'm going to assume it's a 28th, 1987, or close to it. "Defendant, driving a late model van near the intersection of Hyperion (phonetic) Boulevard and Fountain Avenue, at speeds exceeding 70 miles per hour, violently collided with another vehicle traveling in the opposite direction. The driver of that car was killed upon impact. Only minutes before the accident, defendant's van attracted the attention of one witness, Allen Wexler, as it approached the intersection of Hyperion and Griffith Park Boulevard in the Silver Lake Section of Los Angeles. While Wexler slowed for a traffic signal changing to red, he noticed the van pass him on his left at approximately 70 miles per hour and speed through the intersection without stopping." I want to note at the bottom of this page, there is one footnote. "Defendant also was convicted of vehicular manslaughter while intoxicated, driving under the influence of alcohol and or drugs so as to cause bodily injury to another, and causing injury while giving (sic) or driving with a blood alcohol level of .1 or above." Continuing onto page three. "Driving on the wrong side of the street and heading into oncoming traffic, the van swerved back into the correct lane and stopped for a red light at the intersection of Hyperion and Tracy. When the signal changed to green, Wexler again saw the van accelerate at a high rate of speed into the wrong lane of traffic as it neared a curve in the road. Although he briefly lost sight of the van, Wexler arrived at the accident scene within moments of the collision. After seeing that the driver of the other vehicle involved in the accident was severely injured, he summoned help and remained at the scene until the police and paramedics arrived. Another witness, Amitai, A-M-I-T-A-I, Talmor, T-A-L-M-O-R, while working at his auto repair shop on Hyperion, observed the van as it passed by him traveling at 70 to 80 miles per hour on the wrong side of the road. Immediately following the crash, he retrieved his camera and photographed the occupants of the van after they had exited the vehicle. At or about the same time, Talmor noticed the Defendant, who had been sitting behind the wheel after the accident, attempting to remove some beer bottles from the van. Los Angeles Police Officers Michael Hagan (phonetic) and Robert Henshaw (phonetic), both traffic collision experts, arrived at the scene approximately 20 minutes after the accident and began their investigation to determine the cause of the crash. Based upon the position and length of the skid marks, they estimated that the van was traveling on the wrong side of the roadway at a minimum speed of 59 miles per hour at the time of the |

> impact. After inspecting the interior of the van, Hagan determined that the location of several blood stains on the driver's side of the vehicle corresponded to abrasions and blood on the defendant's head, left arm and left knee. He also noticed two empty beer cans and numerous marijuana cigarette butts on the floor of the van. In speaking with the Defendant, both officers noted that the defendant's eyes were glazed and that his breath smelled of alcohol. His eyes also exhibited horizontal and vertical nystagmus, N-Y-S-T-A-G-M-U-S, which is a jerky eye movement, which is indicative of a blood alcohol level of at least .15 percent. Although he admitted to being the driver of the van, the Defendant denied being intoxicated. He later acknowledged, however, that sometime prior to the accident he had smoked marijuana and consumed both beer and wine. Other officers who arrived at the scene sometime later also opined that the Defendant was under the influence of alcohol and/or drugs. Having failed a series of filed sobriety tests, the Defendant was transported to a jail facility where he was admonished pursuant to Vehicle Code Section 13353, the implied consent law. Test results of a blood sample withdrawn approximately two hours after the collision revealed the blood alcohol level of .2 percent. The subsequently administered breath test indicated blood alcohol levels of .17 and .18 percent. Forensic analyst testified at trial that these figures were equivalent to a blood alcohol level of .24 percent at the time of the collision. Testifying in his own defense, Defendant claimed that he could not recall the events leading up to the accident or whether he was the driver of the van. He admitted, however, that he began drinking at approximately 5:30 a.m. on the morning of the collision and probably consumed three to four beers and an unknown quantity of wine."

All right. I'm going to take a look at the board report as well with regards to the commitment offense and to the prisoner's version since he's not speaking about it. And basically, the offense summary on the board report dated April 9th, 2007, indicates that:

> "On March, 28th, 1987, around 12:00 p.m., Ibarra was driving a 1970 Ford van on Fountain Avenue without a driver's license. And as indicated from the appellate ruling, he was driving on the wrong side of the road, speeding, et cetera, and collided with a red Nissan Sentra. The victim, Jaime Angola (phonetic), was seatbelted into the driver's side of the Nissan Sentra and he died at the scene from receiving a large laceration to his forehead and an impression in his skull around the same area. On page two, Mr. Ibarra's version is as follows. 'I didn't remember much about the accident. Some friends and I had been

> drinking beer and smoking marijuana prior to the accident.
> I only remember walking up and checking on the victim,
> but he appeared dead. I then returned to my vehicle to
> check on my passengers. At that point all I could do was
> wait for the police.'"

Answer, Exhibit 1 at 70-76.

Petitioner was convicted of second degree murder and began serving a sentence of 15 years to life on April 7, 1988. Id. at 62. His minimum eligible parole date was May 23, 1998. Id.

On August 15, 2007, the Board held a life parole consideration hearing for petitioner. Id. At the conclusion of that hearing the Board found petitioner unsuitable for parole. Id. at 123-33.

B.  State Habeas Review

Petitioner filed a petition for writ of habeas corpus in the Los Angeles County Superior Court on December 7, 2007. Id. at 2. That petition was denied in a reasoned opinion on February 26, 2008. Answer, Ex. 2 at 3.

Petitioner then filed a petition with the California Court of Appeal on March 25, 2008. Answer, Ex. 3 at 2. That petition was summarily denied on April 3, 2008. Answer, Ex. 5. Petitioner finally petitioned the California Supreme Court on May 28, 2008. Answer, Ex. 4 at 2. That petition was summarily denied on November 12, 2008. Answer, Ex. 6. Petitioner filed this federal petition on December 1, 2008.

III.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas

4

corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001). The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

IV.   DISCUSSION OF PETITIONER'S CLAIM

    A.   Due Process

        1)   Description of Claim

Petitioner argues there was insufficient evidence to support the Board's finding of unsuitability and that the decision therefore violated his right to due process. Petition at 8.

        2)   State Court Opinion

The Los Angeles County Superior Court rejected this argument stating:

> The Court finds that there is some evidence to support the Board's finding that the Petitioner had 3 115s involving the use of a controlled substance in 1996. The Petitioner's testimony at the

> hearing indicated that the substance was heroin. Cal. Code Regs., tit. 15, §2402, subd. (b). The Board also noted that the Petitioner did not have current documentation of viable residential plans in Mexico, if he is deported. Cal. Code Regs., tit. 15, §2402, subd. (b). The Petitioner has been unable to document his residential plans in Mexico to live with his mother despite the fact that he was told to do so at two previous hearings. His inability to receive such confirmation after repeatedly being told to do so is evidence that he does not have plans for life in his home country after deportation.
>
> The Court also finds that there is some evidence to support a finding that multiple victims were attacked, injured, or killed in the same or separate incidents. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(A). The victim dies in the other vehicle, and the Petitioner's statement alluded to other passengers in his vehicle.
>
> In addition, the Board noted that the District Attorney's Office had opposed the Petitioner's release. While this is also not a factor on which the Board may rely to deny parole, such opposition may be properly considered. Penal Code § 3402.
>
> The Board also noted several positive gains that the Petitioner has achieved while incarcerated. However, it concluded that despite these gains, the Petitioner posed an unreasonable threat to public safety at the time of its hearing. Penal Code § 3041(b).

/////

Answer, Ex. 2 at 2-3.

        3)      <u>Applicable Law</u>

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging due process violations must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. <u>Kentucky Dep't of Corrections v. Thompson</u>, 490 U.S. 454, 459-60 (1989); <u>McQuillion v. Duncan</u>, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution or state laws. <u>Board of Pardons v. Allen</u>, 482 U.S. 369, 373 (1987). The United States Constitution does not, of its own force, create a protected liberty interest in a

6

1  parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).

2  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that

3  parole release will be granted' when or unless certain designated findings are made, and thereby

4  gives rise to a constitutional liberty interest." McQuillion, 306 F.3d at 901 (quoting Greenholtz

5  v. Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979)).  In this regard, it is clearly established that

6  California's parole scheme provides prisoners sentenced in California to a state prison term that

7  provides for the possibility of parole with "a constitutionally protected liberty interest in the

8  receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of

9  the Due Process Clause." Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v.

10 Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910,

11 914 (9th Cir. 2003); McQuillion, 306 F.3d at 903; and Allen, 482 U.S. at 377-78 (quoting

12 Greenholtz, 442 U.S. at 12)).  Accordingly, this court must examine whether the deprivation of

13 petitioner's liberty interest in this case violated due process.

14         It has been clearly established by the United States Supreme Court "that a parole

15 board's decision deprives a prisoner of due process with respect to this interest if the board's

16 decision is not supported by 'some evidence in the record,' Sass, 461 F.3d at 1128-29 (citing

17 Superintendent v. Hill, 472 U.S. 445, 457 (1985)); see also Biggs, 334 F.3d at 915 (citing

18 McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457.

19         When assessing whether a state parole board's suitability decision was supported

20 by "some evidence," the analysis "is framed by the statutes and regulations governing parole

21 suitability determinations in the relevant state." Irons, 505 F.3d at 851.  Thus, this court must:

22     look to California law to determine the findings that are necessary
       to deem a prisoner unsuitable for parole, and then must review the
23     record in order to determine whether the state court decision
       holding that these findings were supported by "some evidence" in
24     [petitioner's] case constituted an unreasonable application of the
       "some evidence" principle articulated in Hill.

25 /////

26 Id.

7

1     California law requires that the Board "determine whether a prisoner is presently
2 too dangerous to be deemed suitable for parole based on the 'circumstances tending to show
3 unsuitability' and the 'circumstances tending to show suitability' set forth in Cal.Code. Regs., tit.
4 15 § 2402(c)-(d)." Irons, 505 F.3d at 662-63.

5     The Irons court described the regulations as follows:

> [T]he circumstances tending to show that a prisoner is unsuitable include: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner"; (2) the prisoner's previous record of violence; (3)"a history of unstable or tumultuous relationships with others"; (4) commission of "sadistic sexual offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." Cal.Code. Regs., tit. 15 § 2402(c). Circumstances tending to show that a prisoner is suitable for parole include: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; . . . (6) the prisoner lacks any significant history of violent crime; . . . (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Cal.Code. Regs., tit. 15 § 2402(d).

Id. at 663 n.4.

    In California, the overriding concern in determining parole suitability is public safety and the focus is on the inmate's current dangerousness. In re Dannenberg, 34 Cal.4th 1061, 1086 (Cal. 2005); In re Lawrence, 44 Cal.4th 1181, 1205 (Cal. 2008). The California Supreme Court has stated:

> [T]he Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety [and] the core determination of "public safety" . . . involves an assessment of an inmate's *current* dangerousness. . . . [A] parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate.

/////

In re Lawrence, 44 Cal. 4th at 1205-06 (internal citations omitted).  Accordingly, in reviewing a decision by the Board to deny parole to an inmate, "the relevant inquiry is whether some evidence supports the decision of the Board that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings."  Id. at 1212 (citing In re Rosenkrantz, 29 Cal. 4th 616, 658 (Cal. 2002); In re Dannenberg, 34 Cal. 4th at 1071; In re Lee, 143 Cal.App.4th 1400, 1408 (2006)).

    4) <u>Discussion</u>

The Board based its decision on: a) the circumstances of the commitment offense, b) petitioner's institutional behavior, and c) his lack of a confirmed residence in Mexico.  Answer, Ex. 1 at 123-33.

    a) <u>Commitment Offense</u>

With respect to petitioner's commitment offense the Board stated:

> You were drunk, you were under the influence of marijuana, you tell us you don't remember much.  You were speeding up to and potentially in excess of 70 miles an hour driving on the wrong side of the road.  Your van plowed into that vehicle owned by Jaime Angola, who is your victim, who died at the scene.  It was a horrendous, situation.  The offense was, you know, in my mind it was callous and cruel, drunk driving is.  You've been involved in drinking in the past.  Mr. Wynn, talked to you about whether you were drinking and driving, I'm going to bet you you were and that you have been.  It's lucky that multiple victims were not injured and the you know, like I said, the offense was carried out in a manner, which demonstrated disregard for human suffering.  I couldn't count the number of people that might have been on the road at 12:00 p.m., I mean in my book that's noon.  So the motive for the crime - - I don't know what the motive was is inexplicable, because the victim was in the wrong place at the wrong time and you happen to be the drunk and under the influence of marijuana driver.

/////

Answer, Ex. 1 at 125.

The circumstances of the commitment offense are one of fifteen factors relating to an inmate's unsuitability or suitability for parole under California law.  Cal.Code. Regs., tit. 15 § 2402(c)(1)-(d).  When denial is based on these circumstances the California courts have stated

that:

> A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released. [In re] Dannenberg, 34 Cal.4th [1061] at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005). Factors beyond the minimum elements of the crime include, inter alia, that "[t]he offense was carried out in a dispassionate and calculated manner," that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal.Code. Regs., tit. 15 § 2402(c)(1)(B), (D)-(E)."

/////

Irons, 505 F.3d at 852-5. The Board found the motive for petitioner's commitment offense was "inexplicable."

"An 'inexplicable' motive ... is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim and has no other discernible purpose. A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous." In re Rico, 171 Cal.App.4th 659, 682 (2009) (quoting In re Scott, 119 Cal.App.4th 871, 893 (2004); In re Barker, 151 Cal.App.4th 346, 374 (2007).

The conduct of the victim was obviously not related to the commitment offense. The victim was tragically in the wrong place at the wrong time. Further, petitioner's motive for voluntarily operating a vehicle at high speed despite severe intoxication during the middle of the day is unexplainable. The circumstances of petitioner's commitment offense are such that they were probative to the central issue of his current dangerousness when considered in light of the full record before the Board. In addition to the commitment offense the Board noted petitioner's institutional behavior, specifically his instances of heroin use.

/////

### b) Institutional Behavior

In 1996, petitioner received three 115s for heroin use.[1] Id. at 126. Petitioner had indicated that he engaged in that behavior as a result of his father's death. Id. Petitioner's 115s were however received in February, March and then August of 1996. Id. Under California law, institutional behavior that evidences "serious misconduct" at any time is a circumstance tending to show unsuitability. See Cal. Code Regs. tit. 15, § 2402(c)(6). Further, the fact that petitioner was incarcerated for murder caused by substance abuse and then cited for three instances of substance abuse years later indicated continuing substance abuse issues. Finally, the Board found that petitioner lacked adequate parol plans, specifically a confirmed residence in Mexico.

### c) Lack of Residence

Petitioner entered the United States as an undocumented immigrant around the age of 21. Id. at 79. After his incarceration he became subject to a "US INS hold" indicating that upon his release he will "more than likely . . . be deported back to Mexico." Id. at 85. Petitioner's plan upon his release and deportation to Mexico was to live with his mother and work as a welder for his brother-in-law. Id. at 92-96. Petitioner presented a letter from his brother-in-law stating that he had known petitioner for 27 years and would "provide him with a job that fits his abilities upon his release from prison." Id. at 94-96, 147. At this point in the hearing the Board inquired if petitioner had any additional correspondence and petitioner replied that he believed he had "numerous letters of support from his mother" and "thought that he had given a recent one to his counselor." Id. at 97. Petitioner was unable to produce a current letter from his mother confirming an offer of residence.

In finding petitioner unsuitable the Board stated:

> Mr. Ibarra, you know, during recess we reviewed the decisions from the 2005 Panel, which Commissioner Smith sat on, and the 2006 Panel. Both Panel's had the same recommendation for you

---

[1] A 115 "Rules Violation Report" documents misconduct "believed to be a violation of law or [that] is not minor in nature ." 15 Cal.Code Regs. § 3312(a)(3).

and you were denied a year pretty much for the same thing each of those times. Well, we're denying you a year again for the same thing and that has to do with your parole plans. It's beginning to be very suspect as to whether or not your mother is even alive or if she owns a house or if she wants you to come live with her, because you keep getting told to get letters of support, shore up your parole plans and you'll be on your way and that's not happening. And I will tell you right now, as long as you don't have substantiated parole plans you won't get a date, you know. Commissioner Farmer was very optimistic because he thought perhaps you would follow through with getting parole plans and letters, but you haven't, so I'm not sure what the problem is. Even if your mother were to be ill and have Alzheimer's and have difficulty remembering things, you allegedly have an aunt that lives with her. You have other relatives down there supposedly. We don't know any of that, that's why we need something verified, you haven't heard it before. I'm not sure what the issue is or why you're not following through, but I'm here to tell you today, you won't get a date ever until you have parole plans. You have done well in so many other arenas, I'm not sure if maybe you just don't want to get paroled.

Id. at 124.

The Los Angeles County Superior Court found some evidence to support the Board's finding, stating that petitioner's inability to document his residential plans in Mexico was "evidence that he [did] not have adequate plans for life in his home country after deportation." Answer, Ex. 2 at 2.

Under California law, the Board may consider "any other information which bears on the prisoner's suitability for release." Cal.Code. Regs., tit. 15 § 2402(b). Without a confirmed residence petitioner would very likely be deported to Mexico, after living in the United States for decades, without a stable residence from which to work and ensure his sobriety. The Board conversely, would be at petitioner's mercy to maintain contact. Petitioner's deportation to Mexico presents unique and difficult parole challenges even without the added factor of not knowing where petitioner would reside well ahead of his parole.

/////

/////

/////

V.    Conclusion

The facts of petitioner's commitment offense were probative to his current dangerousness when considered in light of the full record before the Board. That record included petitioner's institutional behavior and his lack of adequate parole plans.

Petitioner's commitment offense was extremely dangerous and put the lives of many at risk. The victim was senselessly killed through absolutely no fault of his own. That fault lies with petitioner's substance abuse issues. Those issues surfaced again in 1996 when petitioner was caught using heroin on three separate occasions. Compounding problems was the fact that petitioner was likely going to be deported to Mexico and did not secure a confirmed residence. Having a place to live is a fundamental concern for both petitioner and the Board. It would be unlikely that petitioner could focus on sobriety and maintain employment without knowing where he will reside. Similarly the Board would be deprived of even the semblance of supervision without knowing where petitioner resides. Because of these factors the Board found petitioner was at that time unsuitable for parole because he was currently dangerous.

Based on this record there was some evidence to support the Board's finding that at the time of the hearing petitioner was currently dangerous. The opinion of the Los Angeles County Superior Court affirming the finding of some evidence was therefore not unreasonable. Petitioner's right to due process was not violated and he is not entitled to relief on this claim.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

1  that failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: June 30, 2009

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

14